NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BARRETT FINANCIAL OF NORTH JERSEY, LLC,<br><div align="center">Plaintiff,</div><br>v.<br><br>CREATIVE FINANCIAL GROUP OF NEW JERSEY,<br><br><div align="center">Defendant.</div> | Civ. No. 13-5621 |
| BARRETT FINANCIAL OF NORTH JERSEY, LLC and EDWARD P. BARRETT,<br><br><div align="center">Plaintiffs/Counterclaim Defendants,</div><br>v.<br><br>NEW ENGLAND LIFE INSURANCE COMPANY,<br><br><div align="center">Defendant/Counterclaim Plaintiff.</div> | Civ. No. 14-3316<br><br><br>**OPINION** |

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court on cross-motions for summary judgment. Plaintiffs Edward P. Barrett and Barrett Financial of North Jersey, LLC (collectively "Plaintiffs") have moved for partial summary judgment. (Civ. No. 13-5621, ECF Nos. 56, 57; Civ. No. 14-3316, ECF Nos. 94, 95.)[1] Defendants Creative Financial Group of New Jersey and New England Life Insurance Company (collectively "Defendants") have moved for summary judgment on all of Plaintiffs' claims across both civil actions. (ECF Nos. 96, 97.) Both motions are opposed. The

---

[1] Since the filings related to the Motions at issue in this Opinion appear on the Civ. No. 14-3316 docket, and only some are duplicated on the Civ. No. 13-5621 docket, all future references to docket entries in this opinion correspond to the 14-3316 docket unless otherwise specified.

Court has decided the motions after considering the parties' written submissions without oral argument pursuant to Local Civil Rule 78.1(b). For the following reasons, Plaintiffs' Motion is denied and Defendants' Motion is granted in part and denied in part.

## BACKGROUND

These related cases arise out of a single contractual relationship and the fallout after its termination but concern different claims and defendants. The cases were informally consolidated for the limited purposes of discovery and case management on August 21, 2014. (*See* ECF No. 13.) The following core facts are undisputed, unless otherwise noted.

**I.      The Contractual Relationship**

Edward Barrett ("Mr. Barrett"), owner of Barrett Financial of North Jersey, LLC ("Barrett Financial") (formerly New England Financial of North Jersey, LLC), became an independent contractor and Managing Partner in 2000 for New England Life Insurance Company ("NELICO"), a life insurance and financial services company. (Defs.' Statement of Undisputed Material Facts ("SMF") ¶¶ 1–5, ECF No. 96-2; Pls.' SMF ¶ 1, ECF No. 103.) Mr. Barrett's governing Managing Partner Contract with NELICO (the "Contract") was executed in December 2007.[2] (Defs.' SMF ¶¶ 6–8; Pls.' SMF ¶ 2; Barrett Dep. 225:16–226:20, ECF No. 97-6; *see also* Defs.' Ex. M, ECF No. 97-13; Pls.' Ex. 1, ECF No. 95-1.) Pursuant to the Contract, Mr. Barrett managed his own employees and payroll but utilized NELICO materials and exclusively sold its products, primarily from a Fairfield, NJ agency location, with affiliated offices in Englewood Cliffs, NJ; Princeton, NJ; and Silver Spring, MD. (Defs.' SMF ¶¶ 9–10.)

---

[2] In the Contract, Mr. Barrett is referred to as the "Corporate Manager," his company (then called New England Financial of North Jersey) is referred to as the "Corporate Managing Partner," and NELICO is referred to as the "Company." (*See* Defs.' Br. at 4 n.3, ECF No. 96-1.) This language differs slightly from the terms used by the parties in their briefs and the Court in its discussion.

Section 16 of the Contract, the "Forfeiture of Contract" provision, specified that

> . . . if the Corporate Managing Partner or a Corporate Manager
> shall knowingly act in a fraudulent or unlawful manner as such
> Corporate Managing Partner or Corporate Manager . . . the
> Contract shall at once terminate without notice . . . .

(Defs.' Ex. M § 16; Pls.' Ex. 1 § 16.) The Contract also included provisions stating that any

debts owed by Barrett Financial (then New England Financial of North Jersey) to NELICO at the

termination of the Contract would be due within 90 days of termination, and that any NELICO

amounts payable to Barrett Financial would be paid within 90 days, subject to NELICO's right to

offset any debt owed to NELICO from any amount payable to Barrett Financial. (Defs.' Ex. M

§§ 17–18; *see also* Defs.' SMF ¶¶ 57–58.)

The Contract did not provide for a buy-out of Barrett Financial upon termination of the

Contract nor address any equity interest transferred by virtue of the contractual relationship.

(Defs.' SMF ¶¶ 75–78.) Further, Section 12 of the Contract provided that all payments of

renewal overrides to Plaintiffs following termination of the Contract would be made "only if all

conditions required by the Contract shall have been fulfilled . . . ." (Defs.' SMF ¶ 69.)

Mr. Barrett asserts that, in addition to the Contract, he participated in the New England

Non-Qualified Retirement Plan for Managing Partners (the "Pension Plan" or "Managing Partner

Retirement Plan ('MPRP')"). (Pls.' SMF ¶ 3.) Mr. Barrett was provided the terms of the Pension

Plan in a plan description document. (Pls.' SMF ¶ 12; Pls.' Ex. 2 ("2015 Program Description"),

ECF No. 95-2.) NELICO contends that Mr. Barrett never vested in the Pension Plan pursuant to

its terms. (Defs.' Suppl. SMF ¶¶ 8–9, 15–20, ECF No. 99-1; *compare* Sabol Decl., Ex. A

("Pension Plan"), ECF No. 99-7 (effective January 1, 2008, with amendments as recent as

October 15, 2013), *with* 2015 Program Description (effective January 2015).) Defendants assert

Mr. Barret is instead eligible for the Managing Partners Account Balance Plan, as well as the

Managing Partners Deferred Compensation Plan, but that benefits are not due to be paid to him for some time. (Defs.' SMF ¶ 72; Defs.' Suppl. SMF ¶¶ 10–14.)

## II.    The Contract is Terminated

Mr. Barrett's company had long employed and sponsored foreign workers on its own payroll, primarily from South Korea, utilizing H-1B visas. (*See, e.g.*, Barrett Dep. 26:9–23, ECF No. 101-8.) Mr. Barrett consulted an immigration attorney, Glenn Martin Miller, to oversee the process of appropriately sponsoring these workers. (Pls.' SMF ¶ 11; Barrett Dep. 26:19–23.) Beginning in the spring of 2012, NELICO informed Mr. Barrett that NELICO was taking over payroll (Defs.' SMF ¶ 12); in April 2012, during this payroll transition, NELICO became aware of Mr. Barrett's foreign-sponsored employees, initiated an investigation, and ultimately informed Mr. Barrett that he had to immediately end the H-1B sponsorships because their applications were misleading and NELICO would not support continuing the sponsorships (*id.* ¶¶ 15–46).

NELICO asserts that Mr. Barrett knowingly submitted fraudulent or misleading H-1B visa applications to the U.S. Citizenship and Immigration Services ("USCIS") to sponsor foreign workers, which, *inter alia*, included an invented job title to suggest greater specialization than was required for the positions, misrepresented the degree requirements and duties of the jobs for which they were hired, and obfuscated the hours their salaries would support, ultimately paying these workers less than the prevailing federal minimum wage by sponsoring them for a part-time salary but staffing them with full-time duties. (*Id.* ¶¶ 15–46.) After NELICO discovered these issues, on August 1, 2012 it terminated Mr. Barrett effective September 30, 2012, suspending him 60 days before the termination took effect pursuant to the Contract. (Defs.' SMF ¶¶ 47–49.) Michelle Pedigo, NELICO Regional Vice-President, informed Mr. Barrett of the termination, which was recorded in a follow-up letter noting his termination "for the reasons we discussed."

4

(*Id.*; Pls.' SMF ¶ 4; Defs.' Ex. N, ECF No. 97-14; Pedigo Dep. 137:18–139:24, ECF No. 97-7; Barrett Dep. 189:1–5, 236:2–239:17, ECF No. 97-6.) NELICO submitted a required U5 report to the Financial Industry Regulatory Authority ("FINRA") that gave "LOSS OF CONFIDENCE (NON-SECURITIES RELATED)" as the explanation for Mr. Barrett's termination. (Pls.' SMF ¶ 10; Pls.' Ex. 5 at 2, ECF No. 95-5.)

### III.   Post-Termination Activities and Disputes

NELICO installed Chris Furrule, Managing Partner of Creative Financial Group of New Jersey ("Creative"), in Mr. Barrett's place to manage the affected NELICO offices. (Defs.' SMF ¶¶ 50–51.) With approval and oversight from NELICO, Creative issued a press release and bought an advertisement in Forbes magazine announcing the appointment of Chris Furrule and the "merger" of "New England Financial Group of North Jersey" and Creative. (Pls.' SMF ¶ 6; Pls.' Opp'n Ex. 16, ECF No. 101-16; Pls.' Opp'n Ex. 17, ECF No. 101-17.)[3] Under the Contract, the phrase "New England Financial" was a registered trademark owned by NELICO. (*See* Pls.' Opp'n Ex. 1, ECF No. 101-1; *see also* Defs.' Ex. M § 21.) Pursuant to the terms of the Contract, however, New England Financial of North Jersey was an independent contractor of NELICO (Defs.' SMF ¶¶ 71, 73), not a subsidiary entity. Further, Chris Furrule did not pay any sum to NELICO in exchange for his increased management responsibilities (*id.* ¶ 78) or otherwise obtain equity in New England Financial of North Jersey at the time of this "merger," as that entity remained owned by Mr. Barrett alone. (*See generally* Defs.' Br. at 27, ECF No. 96-1.)

---

[3] Defendants object to the exhibits Plaintiffs submitted with their opposition brief, arguing they were not properly authenticated. (*See* Defs.' Reply at 4–6, ECF No. 104.) In order to provide as complete an analysis as possible, the Court has consulted these exhibits and cited them where appropriate. Defendants can renew remaining evidentiary objections at trial.

During the transition, Mr. Barrett's assistant and others packed up his personal items and files and delivered them to his home within a week of the termination of the Contract. (Defs.' SMF ¶ 52; *see also id.* ¶ 53.) After Creative took over the Fairfield location, Mr. Barrett's Controller Nancy Kennaly remained in the office for a few months to wind up and manage Barrett Financial's books and affairs. (*Id.* ¶ 54.) NELICO also conducted a reconciliation pursuant to the Contract, determining outstanding debts and revenue owed by and between NELICO and Barrett Financial. (*Id.* ¶¶ 57–58.) Ms. Kennaly inventoried the furniture and fixtures in the Fairfield office, which Creative shared with NELICO to determine which items belonged to Plaintiffs. (*Id.* ¶ 56.) Mr. Barrett came once to the Fairfield office to collect some items, but was unable to take everything at that time. (*Id.* ¶ 60.) When given another opportunity to collect additional items, Mr. Barrett declined, stating "[w]hat am I going to do with 44,000 square feet of office furniture and filing cabinets and wall furnishings?" (*Id.* ¶ 61.) As part of the relief sought in Plaintiffs' governing Complaints, Plaintiffs seek return of financial documents, immigration files, and furnishings they believe to still be within Defendants' possession and control; however, NELICO asserts that the relevant documents were returned to Plaintiffs, but financial records of the firm are the property of NELICO under the Contract. (*Id.* ¶¶ 84–86.)

Creative paid rent at the Silver Spring location for about a year and a half from the time it assumed the office, ending in March 2014. (*Id.* ¶¶ 79–80.) NELICO eventually closed the Englewood Cliffs and Silver Spring offices, which had been leased in Plaintiffs' names. (*Id.* ¶ 59.) Creative never formally took over the lease as renter, leaving Mr. Barrett to settle with the landlord for $10,000 against a default judgment on unpaid rent for the time which remained on the Silver Spring lease after NELICO closed the office there. (Pls.' SMF ¶ 5; Pls.' Opp'n Ex. 13, ECF No. 101-13; Pls.' Opp'n Ex. 14, ECF No. 101-14; *see also* Defs.' SMF ¶ 83.) Plaintiffs also

incurred a separate debt for the unpaid lease of a Toshiba phone system in the Silver Spring office. (*See* Pls.' Opp'n Ex. 3, ECF No. 101-3.)[4]

Plaintiffs assert that Creative was improperly given access to a Taleo recruiting database, which Barrett Financial used to gather and house information on potential financial advisors. (Defs.' SMF ¶ 87.) NELICO had a separate company-wide Taleo database, but Barrett Financial maintained its own secure database. (*Id.* ¶ 88.) Creative employees assumed that the Barrett Financial Taleo database was paid for and owned by NELICO, and changed the password during the transition, preventing Plaintiffs from accessing their own data for ten or eleven months. (*Id.* ¶¶ 89–94.) Creative stopped accessing this separate, non-NELICO database once it learned there was a dispute over ownership. (*Id.* ¶ 96.)

## IV.    Abbreviated Litigation History

Plaintiffs filed two separate lawsuits against Defendants with a host of contract and tort claims. In 2013, Plaintiff Barrett Financial brought suit against Creative and in 2014, Plaintiffs brought suit against NELICO. NELICO answered and asserted contract-based counterclaims. The parties then engaged in discovery. All told, Plaintiffs assert, based on their expert reports, that Mr. Barrett is owed $1,057,115.79 under the Contract (Pls.' SMF ¶ 8) and $2,221,931.24 under the Pension Plan (*id.* ¶ 13). On its breach of contract counterclaim, NELICO seeks damages of more than $800,000 for incentive compensation advances for 2011–2012 that were paid to Mr. Barrett as loans; Home Office Accounts Receivable ("HOAR") charges incurred by NELICO on behalf of Plaintiffs; and other sums. (Defs.' SMF ¶ 67.)

---

[4] Plaintiffs' claim regarding buying out the telephone system contract at the Silver Spring office did not arise until after NELICO terminated the Contract and Plaintiffs had filed the original Complaint in this lawsuit. (Defs.' SMF ¶ 81.) The Amended Complaint reflects this claim. (Am. Compl. ¶¶ 79–85, ECF No. 23.)

The parties filed cross-motions for summary judgment on January 12, 2018. Plaintiffs have moved for partial summary judgment only against Defendant NELICO, and only on Plaintiffs' breach of contract claim, a claim for benefits under the Pension Plan, and NELICO's counterclaim for breach of the implied covenant of good faith and fair dealing. (ECF Nos. 94, 95.) Defendants oppose. (ECF No. 99). Plaintiff has replied (ECF No. 102), also submitting a late-filed Statement of Undisputed Material Facts (ECF No. 103) which the Court has considered in its discretion (*see* ECF No. 115). Judge Martinotti permitted Defendants to file one extra-long brief covering claims in the two separate lawsuits. (ECF Nos. 92, 93.) Defendants have moved for summary judgment on all claims asserted by Plaintiffs, but not on their own counterclaims. Their combined brief (ECF Nos. 96, 97), all opposition thereto (ECF Nos. 100, 101), and their reply (ECF No. 104) appear only on the 14-3316 docket. These cases were reassigned to Judge Anne E. Thompson on April 16, 2018. The Court now considers the Motions.

## LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002). In resolving a motion for summary judgment, a district court considers the facts drawn from "materials in the

record," including depositions, documents, affidavits, and declarations. Fed. R. Civ. P. 56(c)(1)(A). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. However, "[s]ummary judgment is inappropriate if an issue depends upon the credibility of witnesses, because credibility can best be determined only after the trier of fact observes the witnesses' demeanor." *Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1492 n.17 (3d Cir. 1985), *judgment vacated*, 475 U.S. 1105 (1986). Summary judgment is similarly inappropriate when a party's knowledge is at issue, "because evaluating state of mind often requires the drawing of inferences from the conduct of parties about which reasonable persons might differ." *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 524 (3d Cir. 2004), *as amended* (Aug. 12, 2004).

## DISCUSSION

### I.     Claims Against NELICO

NELICO moves for summary judgment on all of Plaintiffs' claims: conversion, trespass to chattels, and unjust enrichment (Counts I, II, and IV); breach of contract and breach of the duty of good faith and fair dealing (Counts III and VI); unlawful interference with prospective economic advantage and tortious interference with an existing contract (Counts V, VIII, and IX); and indemnification (Count VII). Plaintiffs move for summary judgment on their own breach of contract claim (Count III), an un-pled breach of the Pension Plan, and NELICO's counterclaim for breach of the duty of good faith and fair dealing (Second Counterclaim). As an initial matter, Defendants assert and Plaintiffs do not deny that the Contract is governed by Massachusetts law, but all tort claims are governed by New Jersey law.

A.  <u>Contract-Related Claims: Breach of Contract (Counts III), Unjust Enrichment (Count IV), and Breach of the Duty of Good Faith and Fair Dealing (Count VI)</u>

Plaintiffs seek summary judgment and damages for breach of contract based on NELICO's failure to pay amounts Plaintiffs believe are due and owing under the Contract, particularly vested renewal overrides under Section 12. (*See* Pls.' Br. at 5–13, ECF No. 95.) Defendants argue that Plaintiffs' breach of contract claim fails, and therefore summary judgment must be entered for Defendants, because Plaintiffs' conduct allowed them to lawfully void the contract by its express terms.[5] (Defs.' Br. at 20–24.) Alternatively, Defendants argue their right to a setoff under Section 18 precludes summary judgment in favor of Plaintiff.

The reason for Mr. Barrett's termination is hotly contested by the parties and material to their contract-related disputes. Plaintiffs argue that NELICO never indicated that Mr. Barrett was fired for cause or for engaging in fraud and, instead, Mr. Barrett's termination was motivated by Defendants' desire to forego having to pay him a vested benefit under the Pension Plan. (Pls.' Br. at 7–9, ECF No. 95; Pls.' Opp'n Br. at 7–10, ECF No. 100.) Defendants argue that, though not fired for cause because of NELICO's longstanding professional relationship with Mr. Barrett, Mr. Barrett was fired for misleading, unlawful conduct under Section 16 of the Contract, which allowed Defendants to cancel the Contract. (*See* Defs.' Opp'n Br. at 11–13, ECF No. 99.)

The "forfeiture of contract" language in Section 16 is broad-textured, triggered when the Corporate Managing Partner or Corporate Manager "knowingly act[s] in a fraudulent or unlawful

---

[5] Section 16 of the Contract enshrines the general contract law principle that a material breach of the contract by one party excuses the other party's subsequent performance under the contract, *see, e.g.*, *Lease-It, Inc. v. Mass. Port Auth.*, 600 N.E.2d 599, 602 (Mass. App. Ct. 1992). The Contract re-styles this principle by voiding the Contract in the face of one party's knowing fraudulent or unlawful conduct, instead of merely excusing performance. While material breach would therefore traditionally appear as a defense to enforcement, here it appears as a claim to enforce the contract.

manner . . . ." (Defs.' Ex M at 7; Pls.' Ex. 1 at 7.) At least part of the provision is subject to "the opinion of the Company" on whether the manager "has engaged in the behavior described in this Section . . . ." (Defs.' Ex M at 7; Pls.' Ex. 1 at 7.) Defendants assert that Mr. Barrett "knowingly act[ed] in a fraudulent or unlawful manner" in sponsoring H-1B visa holders who were not eligible for those visas on two scores: (1) their positions did not require Bachelor's degrees, but Mr. Barrett represented that they did in order to meet federal requirements for the visa sponsorships, and (2) they were hired as full-time employees, but Mr. Barrett sponsored them as part-time employees in order to comply with federal prevailing wage standards. Plaintiffs argue that Defendants cannot raise a fraud defense at this stage when it was never pled with particularity as an affirmative defense or counterclaim. (Pls.' Opp'n Br. at 12–14, ECF No. 100.)

First, the phrase "fraudulent or unlawful manner" is not defined in the Contract. Nothing in the Contract requires Defendants to have pled fraud as an affirmative defense or to have brought an action charging Plaintiff with fraud in order to invoke this provision. Thus, Plaintiffs' argument is unavailing. (*See* Defs.' Opp'n Br. at 10, ECF No. 99.) Indeed, Defendants do not argue that Plaintiffs perpetrated a fraud against Defendants. Rather, Defendants argue that Plaintiffs engaged in fraudulent conduct directed toward USCIS by submitting false or misleading H-1B visa applications. The Court does not interpret the Contract to require that a Corporate Managing Partner or Corporate Manager be charged with fraud, or served with a fraud claim, to trigger this provision. The appropriate standard seems to be whether NELICO reasonably believed Mr. Barrett had acted dishonestly, misrepresented a fact material to his job duties, or otherwise acted unlawfully in the performance of the managerial role.[6]

---

[6] Black's Law Dictionary defines "fraud" as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment." *Fraud*, Black's Law Dictionary (9th ed. 2009). Further, it defines "fraudulent act" as "[c]onduct involving bad

Second, this section also specifies that the Contract would be forfeited and voided only when the Corporate Managing Partner or Corporate Manager "knowingly" acted in a fraudulent or unlawful manner. (Defs.' Ex M at 7; Pls.' Ex. 1 at 7.) The question of whether Mr. Barrett knew that the immigration forms were misrepresentations or were unlawful is a genuinely disputed material fact. Mr. Barrett avers that he relied on the advice of counsel in preparing the visa applications as well as verbal representations, application reviews, and a generally permissive policy by NELICO's corporate staff in determining that the company would permit him to hire Korean nationals. (*See* Pls.' Opp'n Br. at 8; Pls.' Opp'n Ex. 18, ECF No. 101-18.) NELICO avers that it maintained a policy of not soliciting or sponsoring H-1B visa candidates and would never have approved Mr. Barrett's sponsorships if it understood the manner by which he documented and obtained the visas.

This dispute is dispositive to the parties' rights under the Contract and its centrality precludes summary judgment. The parties' respective claims for breach of the implied covenant of good faith and fair dealing, a claim sounding in contract law, are likewise genuinely disputed. Therefore, summary judgment is denied on Plaintiffs' breach of contract and good faith and fair dealing claims (Am. Compl., Counts III, VI, ECF No. 23) and NELICO's good faith and fair dealing counterclaim (Second Counterclaim, ECF Nos. 9, 28).

Plaintiffs also make a claim for unjust enrichment against NELICO, which sounds in tort but arises under the Contract. Defendants assert this claim is barred by the economic loss doctrine. "[T]he economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which they are entitled only by contract. . . . Whether a tort claim can be asserted

---

faith, dishonesty, a lack of integrity, or moral turpitude." *Fraudulent Act*, Black's Law Dictionary (9th ed. 2009).

alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 308 (D.N.J. 2009) (citation omitted). Plaintiffs allege that NELICO was unjustly enriched because it has yet to pay Plaintiffs under the Contract. (Am. Compl. ¶¶ 48–50.) The Amended Complaint as pled admits that the alleged tortious conduct is not "extrinsic to the contract between the parties" but in fact directly arises from it. (Defs.' Br. at 20.) Therefore, summary judgment is granted in favor of NELICO on Count IV of Plaintiffs' Amended Complaint.

B. <u>Pension Benefits</u>

Without having pled a separate Count or cause of action under the Pension Plan in the Amended Complaint against NELICO, Plaintiffs also move for summary judgment for the benefits allegedly due to Mr. Barrett under the Pension Plan. Assuming without deciding that Plaintiffs have sufficiently pled a claim regarding benefits (*compare* Defs.' Opp'n Br. at 17–19, *with* Pls.' Reply at 2, ECF No. 102), it is clear that Mr. Barrett never vested in the Pension Plan.

The Pension Plan document which appears to have governed during the time of Mr. Barrett's contractual relationship with NELICO states unequivocally, "The Participant shall vest in her/his Accrued Benefit upon the later of: (1) reaching age 55 and (2) attaining 5 years of Credited Service." (Pension Plan ¶ 6.1, ECF No. 99-7.) The parties agree that Mr. Barrett was terminated at age 49, with 18 years of service. (*See, e.g.*, Defs.' Suppl. SMF ¶ 17.) Since he had already attained five years of Credited Service, the later of the two trigger events would be attaining age 55. He was still six years away and therefore did not vest in the Pension Plan before the Contract terminated. His accrued benefit is therefore forfeited. (Defs.' Opp'n Br. at 20.) Even under the draft 2015 Program Description on which Plaintiffs rely, the "At A Glance" table on page two explains in the "Vesting and Forfeitures" column: "You will vest in your accrued

benefit **upon the later of the date** you attain age 55 while working as a Managing Partner (or, after December 31, 2014, in a MetLife Sales Management Role) **or** complete 5 years of Credited Service or Vesting Service." (Pls.' Ex. 2 at 2, ECF No. 95-2 (emphasis added).)[7]

Plaintiffs ignore this provision and rely on the later description under the heading "Vesting," which reads: "Your accrued benefit under the Plan will vest when you: (i) attain age 55 while you are a Managing Partner or work in a Sales Management Role; or (ii) complete 5 years of Credited Service or Vesting Service, whichever occurs later." (*Id.* at 8.) Plaintiffs argue that this use of punctuation—a semicolon separating the two triggering events, with only a comma separating the phrase "whichever occurs later"—suggests that the phrase "whichever occurs later" does not modify the options separated by semicolons, but rather applies to the alternatives of "Credited Service" and "Vesting Service" in the second clause. (Pls.' Br. at 14–16, ECF No. 95.) This grammatical argument follows standard principles of contract interpretation. (*See id.* at 15–16.) Following Plaintiffs' logic, Mr. Barrett vested because he had 18 years of service.

Plaintiffs' interpretation fails for two reasons: (1) it is inconsistent with the above-quoted language from the At A Glance of the same document, and (2) the definition of Vesting Service clarifies the drafters' intent. The paragraph immediately following the language on which Plaintiffs rely explains, "'Vesting Services' [sic] means service with MetLife in a Sales Management Role after a Managing Partner Contract terminated. Vesting Service only applies to individuals whose roles converted directly from a Managing Partner role to a Sales Management

---

[7] The Court notes that the 2015 Program Description explains, "Since this Program Description provides a summary of the Plan, it neither replaces the official Plan documents that legally govern the Plan, nor does it cover all aspects of the Plan. The applicable Plan documents will govern in every respect." (Pls.' Ex. 2 at 3.) The paragraph continues by providing a phone number from which a participant can request a copy of the Plan documents.

Role between January 1, 2014, and January 31, 2015." (Pls.' Ex. 2 at 8.) Since Mr. Barrett had

no contractual relationship with MetLife during the definitional period, he had no Vesting

Service. (*But see* Pls.' Br. at 14 ("Mr. Barrett had <u>both</u> 5 years of credited service and vesting

service." (emphasis in original).) It appears the phrase Vesting Service was added to reflect a

transition in roles at NELICO, not to be an alternative path of vesting in the Pension Plan which

could happen "later" than one's Credited Service.

The Court finds the phrase "whichever occurs later" applies to the semicolon-separated

alternatives—reaching age 55 or attaining 5 years of Service (whether Credited or Vesting). Mr.

Barrett thus never vested in the Pension Plan and has no claim to benefits. (*See* Pls.' Ex. 2 at 8

("If your accrued benefit under the Plan is not vested at the time your Managing Partner

relationship with the Company . . . terminates for any reason other than death, your entire

accrued benefit under the Plan will be forfeited.").) Summary judgment is denied to Plaintiff

Barrett on any claims regarding the Pension Plan, and to the extent they were sufficiently pled,

these claims may not proceed.

C.   <u>Tort-Based Claims</u>

1.   *Counts I and II: Conversion and Trespass to Chattels*

The companion torts of conversion[8] and trespass to chattels[9] boil down to wrongful

interference with an individual's possession or use of their own property. In the Amended

---

[8] "The elements of common law conversion under New Jersey law are (1) the existence of
property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the
wrongful interference with that right by defendant." *Ricketti v. Barry*, 2015 WL 1013547, at *8
(D.N.J. Mar. 9, 2015)
[9] "A trespass to chattel may be committed by 'intentionally (a) dispossessing another of the
chattel, or (b) using or intermeddling with a chattel in the possession of another.'" *Exxonmobil
Oil Corp. v. Wakile & Sons, Inc.*, 2009 WL 3818151, at *3 (D.N.J. Nov. 13, 2009) (citations
omitted).

Complaint, Plaintiffs allege that Defendants wrongfully retained possession of Plaintiffs' files, furnishings, and fixtures, "including [Barrett Financial's] financial records, personal client files, employee files (including immigration files related to work visa sponsorships) and Barrett's personal files containing confidential information about Barrett and his family, balance sheets and tax returns, office equipment and furnishings, databases, and systems purchased by Barrett and/or [Barrett Financial]." (Am. Compl. ¶ 27.) Defendants argue that Plaintiffs' property tort claims fail because (1) Plaintiffs have not identified the wrongfully possessed property with sufficient specificity, (2) Plaintiffs voluntarily abandoned the property, and (3) the claims are barred by the economic loss doctrine. (Defs.' Br. at 17–20; *see also* Defs.' Reply at 10–12, ECF No. 104 (focusing on economic loss doctrine).) At summary judgment, Plaintiffs supported their allegations with documentary evidence, including a copy of an office inventory created by Mr. Barrett, and Mr. Barrett's deposition testimony. (*See, e.g.*, Pls.' Opp'n Ex. 5, ECF No. 101-5.) Based on this record evidence, Plaintiffs have sufficiently specified the disputed property.

The Court next considers whether Plaintiffs abandoned the property, which is a complete defense to these torts. *See, e.g.*, *Taffaro v. Taffaro*, 2015 WL 3511932, at *3 (N.J. Super. Ct. App. Div. June 5, 2015) ("Property is abandoned when its possessor voluntarily relinquishes 'all right, title, claim and possession,' of the property 'with the intention of not reclaiming it.' It follows then that abandonment is a complete defense to conversion." (citation omitted)). Citing Mr. Barrett's deposition, Defendants argue that Mr. Barrett's failure to retrieve the property he believes was wrongfully withheld from him absolves them of any liability in tort. (Defs.' Br. at 18–19 (citing Barrett Dep. 273:6–8).) However, Defendants selectively parse Mr. Barrett's testimony, failing to note that he was told and believed he would be arrested if he returned to the office premises. (*See generally* Barrett Dep. 271:9–274:13.) Therefore, the Court does not find

that Defendants have met their burden to prove that Mr. Barrett voluntarily relinquished the property with the intention of not reclaiming it. At the very least, his intention is a disputed fact. Whether Defendants demonstrated intent to deprive Plaintiffs of their property is also a disputed fact.

Finally, the Court considers the applicability of the economic loss doctrine, *see supra* Section I.A. (determining that economic loss doctrine bars Plaintiffs' claim of unjust enrichment). Some of the items for which Plaintiffs now seek compensation may have been subject to the Contract. (*See* Defs.' Ex. M (Section 8, which governs books, records and bank deposits of the firm; and Section 9, which governs office supplies, furniture, equipment and fixtures "furnished by the Company").) Although Defendants argue the Contract deals sufficiently with "physical assets" (*see* Defs.' Br. at 27), and therefore precludes tort remedies, the Contract is silent as to office supplies, furniture, equipment, and fixtures *supplied by Plaintiffs*, as well as Barrett Financial's employee personnel files and personal client files—the bulk of the property Plaintiffs seek. The Contract was drafted to protect NELICO, and specifies NELICO's ownership rights post-termination, without commenting on Plaintiffs' rights to property that Plaintiffs had furnished for company use, including before Plaintiffs had a contractual relationship with NELICO. Much of the property in question is arguably extrinsic to the Contract, and the Court denies summary judgment on the basis of the economic loss doctrine. The conversion and trespass to chattels claims (Counts I and II) survive summary judgment.

### 2. *Count V: Unlawful Interference with Prospective Economic Advantage*

Under New Jersey common law, "[a]n action for tortious interference with a prospective business relation protects the right to pursue one's business, calling or occupation free from . . . [t]he luring away, by devious, improper and unrighteous means, [] the customer of another."

*Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 36 (N.J. 1989) (internal citations and quotations omitted). A plaintiff must prove (1) the existence of a protectable right leading to a reasonable expectation of economic advantage; (2) that the defendant interfered with that right intentionally and with malice; (3) that the interference caused the loss of the prospective gain; and (4) that the injury caused damage. *Id.* at 37.

Plaintiffs assert that NELICO interfered with Plaintiffs' prospective economic advantage and attempted to coopt Plaintiffs' customer goodwill through the post-termination announcement of a "merger" between Creative and the entity which became Barrett Financial. (*See* Pls.' Opp'n Br. at 14–16; *see also* Am. Compl. ¶¶ 51–57.) Defendants argue that Plaintiffs' claim for unlawful interference with prospective economic advantage is barred as a matter of law because of the contractual relationship between Plaintiffs and NELICO. (*See* Defs.' Br. at 28 (citing *Printing Mart-Morristown*, 563 A.2d at 37 ("Where a person interferes with the performance of his or her own contract, the liability is governed by principles of contract law.")).) However, this rule of law is inapposite to Plaintiffs' claim, because Plaintiffs assert NELICO interfered with Plaintiffs' prospective business relationships with clients and business partners *after the Contract was terminated*. (*See* Pls.' Opp'n Br. at 15.)

Nevertheless, a claim for tortious interference with prospective economic advantage requires a plaintiff to identify more than a potential relationship, but rather one that would deliver "a reasonable expectation of economic benefit." *Printing Mart-Morristown*, 563 A.2d at 38; *see also Diversified Indus., Inc. v. Vinyl Trends, Inc.*, 2016 WL 6897783, at *9 (D.N.J. Nov. 22, 2016) ("To prevail on such a claim, 'a plaintiff must show that if there had been no interference[,] there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits.'" (quoting *Printing Mart-Morristown*, 563 A.2d at

18

37)). Beyond broad, speculative statements (*see, e.g.*, Pls.' Opp'n Br. at 15 (suggesting Plaintiffs "could have continued [to operate] through a contract with another insurance company[,]" but were prevented from doing so by the announcement of the merger)), Plaintiffs have not identified for the Court any prospective or nascent client or contractual relationship harmed by the "merger" announcement. Indeed, because Plaintiffs could no longer sell NELICO products once the Contract ended, their economic prospects were far more speculative. On this record, Plaintiffs have not adduced sufficient evidence to demonstrate a genuine dispute of material fact with respect to their own economic prospects.[10] Therefore, summary judgment will be granted for Defendant NELICO on Count V.

   3.   *Counts VII, VIII, and IX: Express and Implied Indemnification and Tortious Interference with an Existing Contract*

Plaintiffs' claims for indemnification and tortious interference with an existing contract relate to the same underlying facts. Plaintiffs aver that they were forced to settle claims against their lease in the Silver Spring office and against phone system contracts for both the Silver Spring and Fairfield offices due to NELICO's intentional interference with those contracts; alternatively, NELICO is liable to indemnify because it effectively took over those contracts by paying the rent and deriving contractual benefits owed to Plaintiffs. (*See* Am. Compl. ¶¶ 61–85.)

---

[10] At the time of the announcement Mr. Barrett's company was named New England Financial of North Jersey—a name which included the registered trademark "New England Financial," owned by NELICO pursuant to the Contract. (*See* Pls.' Opp'n Ex. 1, ECF No. 101-1; *see also* Defs.' Ex. M § 21.) The "merger" announcement therefore presents complicated questions about whether Defendant NELICO was within its rights under the Contract or whether the announcement was extrinsic to the Contract and interfered with Plaintiffs' rights. (*See, e.g.*, Pls.' Opp'n Ex. 17, ECF No. 101-17 (email records among MetLife personnel discussing the language and timing of the merger announcement, including an email dated 9/12/12 in which Michelle Pedigo noted "Due to legal constraints, we can't use the North Jersey name.").) However, these questions are not material to Plaintiffs' reasonable expectations of economic benefit.

"Under New Jersey law, to establish a claim of tortious interference with contract a plaintiff must show (1) it was a party to an existing contractual relationship; (2) the defendant intentionally interfered with that contractual relationship; (3) the interference was undertaken with malice; and (4) plaintiff suffered damages resulting from the interference." *Diversified Indus., Inc.*, 2016 WL 6897783, at *6 (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1992); *Printing Mart-Morristown*, 563 A.2d at 37). Although Plaintiffs introduced evidence to support the existence of the contractual relationships and damages suffered (*see* Pls.' Opp'n Ex. 3, ECF No. 101-3; Pls.' Opp'n Ex. 11, ECF No. 101-11; Pls.' Opp'n Ex. 13, ECF No. 101-13; Pls.' Opp'n Ex. 14, ECF No. 101-14), they have voluntarily abandoned these claims (*see* Pls.' Opp'n Br. at 1 n.1, 21 n.10). Therefore, summary judgment is granted in favor of Defendant NELICO on Counts VIII and IX.

Under the parallel indemnification theories, Plaintiffs argue that NELICO is obligated under the Contract to indemnify Barrett Financial or, alternatively, that Plaintiffs are entitled to equitable indemnification for the amount paid on the leased space occupied by and leased phone systems utilized by NELICO. Turning first to express indemnification, Defendants compellingly argue that the indemnification provision of the Contract in Section 6 does not apply to the circumstances here. (*See* Defs.' Br. at 34–36 (citing Defs.' Ex. M § 6).) By a plain reading of the Contract, the indemnification provision ceased to govern the conduct of the parties when the Contract terminated. The events which led to the debts that Plaintiffs seek to have indemnified transpired more than a year after the contractual relationship terminated. NELICO cannot be held liable under the Contract for conduct that transpired post-termination, when it was no longer acting pursuant to the Contract. Summary judgment is granted in favor of Defendant NELICO on Plaintiffs' express indemnification claim in Count VII (Compl. ¶¶ 65–69).

Plaintiffs argue in the alternative that NELICO is liable under equitable or implied in fact indemnification because a "special relationship" exists between NELICO and Plaintiffs arising from the fact that "Defendants opted to seize the business of [Plaintiffs]." (*See* Pls.' Opp'n Br. at 18; *see also* Am. Compl. ¶¶ 61–64). "[I]mplied indemnification by way of a special relationship is a 'narrow doctrine' that is not frequently stretched beyond the examples of principal-agent, employer-employee, lessor-lessee, and bailor-bailee." *Katz v. Holzberg*, 2013 WL 5946502, at *3 (D.N.J. Nov. 4, 2013) (citation omitted). Defendants argue that Plaintiffs cannot benefit from this doctrine, as "Plaintiffs have offered no legal justification to expand this narrow doctrine to the instant independent contractor relationship." (Defs.' Reply at 13; *see also* Defs.' Br. at 32–33.) This retort is a red herring—Plaintiffs do not base implied indemnification on the contractual relationship, but rather on post-termination events. In essence, Plaintiffs argue that NELICO impliedly took over Plaintiffs' lease contracts and should not be able to have made decisions affecting Plaintiffs' liability on the leases, without any advanced warning to Plaintiffs, without having to bear the financial consequences for those decisions. Construing all facts in Plaintiffs' favor, the post-Contract state of affairs may be akin to a lessor-lessee relationship. Noting that the other elements of Plaintiffs' claim remain disputed, the equitable indemnification theory may proceed. Summary judgment is denied on Count VII (Compl. ¶¶ 61–64).

## II.     Claims Against Creative

As an initial matter, Plaintiff Barrett Financial "does not oppose dismissal of Claim VIII against [Defendant Creative] (Violation of the Computer Fraud and Abuse Act) . . . ." (Pls.' Opp'n Br. at 18 n.9.) Accordingly, summary judgment is granted in favor of Defendant Creative on Count VIII of Plaintiff Barrett Financial's Complaint (Civ. No. 13-5621, ECF No. 1).

A.  Counts I & II: Conversion & Trespass to Chattels

1. *As to Physical Property*

Much of the above analysis of conversion and trespass to chattels with respect to

Defendant NELICO (*see supra* Section I.C.1; *see also supra* notes 8 and 9) applies with equal

force to Plaintiff Barrett Financial's claims against Defendant Creative with respect to physical

property. The parties genuinely dispute Creative's intent to exercise dominion over or to interfere

with Plaintiff's use of the physical property, as well as Barrett Financial's intent to voluntarily

abandon the property. Summary judgment is denied to Defendant Creative on Counts I and II

with respect to physical property (Civ. No. 13-5621, Compl. ¶¶ 15–26, ECF No. 1).

2. *As to Data*

Under New Jersey law, "[c]onversion requires interference with tangible rather than

intangible property." *Argush v. LPL Fin. LLC*, 2014 WL 3844822, at *6 (D.N.J. Aug. 5, 2014)

(internal quotations omitted). New Jersey law does not accommodate a claim for conversion of

data, which constitutes intangible property. *See, e.g.*, *Bellak v. Wells Fargo & Co.*, 2017 WL

6496563, at *5 (D.N.J. Dec. 19, 2017) (citing *Mu Sigma, Inc. v. Affine, Inc.*, 2013 WL 3772724,

at *11 (D.N.J. July 17, 2013) ("[C]lient lists, pricing information and the like . . . are not

considered tangible objects for the purposes of conversion.")); *see also Syngy, Inc. v. ZS Assocs.,*

*Inc.*, 2015 WL 899408, at *40 n.13 (E.D. Pa. Mar. 3, 2015) (collecting cases under New Jersey

law on conversion's required element of tangible property). Therefore, summary judgment is

granted in favor of Defendant Creative with respect to data on Count I.

New Jersey courts have not squarely addressed whether the tort of trespass to chattels can

apply to intangible property that has been wrongfully possessed or used. Defendants cite a single

case out of the Western District of Tennessee which dismissed a trespass to chattels claim under

Florida law on this basis. (Defs.' Br. at 43 (citing *Inventory Locator Serv., LLC v. Partsbase, Inc.*, 2005 WL 2179185, at *11–12 (W.D. Tenn. Sept. 6, 2005)).) Further, Plaintiff "fails to cite any support for the proposition that anything other than tangible personal property, or tangible evidence of title to intangible or real property[,] is subject to [trespass to chattels] so that a cause of action may lie." *Cameco, Inc. v. Gedicke*, 690 A.2d 1051, 1058 (N.J. Sup. Ct. App. Div. 1997), *aff'd as modified and remanded*, 724 A.2d 783 (N.J. 1999). The Court is left to consult the Restatement (Second) of Torts, which dictates that, like conversion, trespass to chattels requires tangible personal property over which one can have physical control. *See* Restatement (Second) of Torts §§ 216–217; *see also Chattel*, Black's Law Dictionary (9th ed. 2009) ("Movable or transferable property; personal property; esp., a physical object capable of manual delivery and not the subject matter of real property."). Without a broadened understanding of the term "chattel" from the New Jersey legislature or Supreme Court, the Court enters summary judgment in favor of Defendant Creative with respect to data on Count II.

   3.   Counts III–VII: Remaining Claims Regarding Data

   In two final sections of their brief, Defendants move for summary judgment on all of Barrett Financial's remaining claims: Count III (misappropriation of trade secrets), Count IV (fraud/misrepresentation); Count V (unjust enrichment), Count VI (intentional interference with contractual relations), and Count VII (unlawful interference with prospective economic advantage). (Defs.' Br. at 47–58.) Barrett Financial has asserted these claims based on "Creative's password change request for the [Barrett Financial]-specific Taleo database, Oracle's refusal to grant [Barrett Financial] access thereafter, and the resulting 10–11 months before access was fully restored." (Defs.' Br. at 47.) In their opposition brief, Plaintiffs "do not contest dismissal" of these claims. (*See* Pls.' Opp'n Br. at 1 n.1; *see id.* at 21 n.10); thus, Defendants

argue on reply that Barrett Financial has abandoned these claims (*see* Defs.' Reply at 1, 14). "[W]here a properly filed and supported summary judgment motion is unopposed, it would be an exceptional case where the court concludes that summary judgment should nonetheless be denied or withheld, although the Court has discretion to do so if unsatisfied that the law and facts point to judgment as a matter of law." *Ruth v. Selective Ins. Co. of Am.*, 2017 WL 592146, at *3 (D.N.J. Feb. 14, 2017). Having reviewed Defendants' arguments on all five claims, the Court finds Plaintiffs have failed to demonstrate even the existence of genuinely disputed material facts with respect to required elements on all claims, and Creative merits judgment as a matter of law. (*See* Defs.' Br. at 47–51 (highlighting lack of evidence that Creative misappropriated the Taleo database data, benefitted from use of the data, intended to defraud or misrepresent ownership of the Taleo database, or that Barrett Financial suffered any concrete or estimable damages as a result of temporary lack of access to the database).) Accordingly, summary judgment is granted in favor of Defendant Creative on Counts III–VII.

## CONCLUSION

For the reasons stated herein, Plaintiffs' Motion is denied and Defendants' Motion is granted in part and denied in part. An appropriate order will follow.


Date:   July 24, 2018                                    */s/ Anne E. Thompson*
                                                         ANNE E. THOMPSON, U.S.D.J.